**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
*11:32 am, Nov 19, 2025*
**JEFFREY P. COLWELL, CLERK**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

WILLIAM MONTGOMERY,

     Plaintiff,

v.

JUAN PACHECO,
MATTHEW LACKEY.

     Defendants.

---

## COMPLAINT

---

COMES NOW that William Montgomery, proceeding *pro se*, respectfully submits to the Court the following COMPLAINT, and in support thereof, states as follows:

### INTRODUCTION

1.    This is a Fourth Amendment civil rights action seeking damages against two Adams County police officers for their misconduct in unlawfully searching, seizing, and non-custodially arresting Plaintiff, for a crime that he could not have committed, which needlessly caused him loss of liberty, emotional distress, and other dignitary injuries.

2.    One afternoon Plaintiff went shopping at a Best Buy store.  He selected and paid for his merchandise, just as any regular customer would.  Upon exiting, he was asked by a store employee and security guard who had been "posted up" at the store's exit to show them his receipt, but to which he politely declined to provide as he had learned in the past he was not required by

1

any law or store policy to do.  But then, upon declining the request, the store employee and security guard prevented Plaintiff from leaving the store, and detained him inside of it while they summoned the local police for assistance.  When the Defendant Officers arrived, they conducted no meaningful investigation into the matter, instead relying exclusively on the delegated statements made by the store employee and security guard to arrest Plaintiff on-the-spot for purportedly shoplifting from the store.  Once the officers arrested Plaintiff, they searched him, seized all property found on him, performed a backwards investigation into his innocence, and eventually let him go once they conclusively determined that he did not steal anything from the store.

3.    Plaintiff William Montgomery now seeks vindication regarding the wrongful search, seizure, and non-custodial arrest of him, and a remedy for the loss of liberty, emotional distress, and dignitary injuries he suffered by the violation of his Fourth Amendment rights.

**PARTIES**

4.    WILLIAM MONTGOMERY resides at 2443 S University Blvd # 129, Denver, CO, 80210.  His phone number is (970) 412-5463.  His email address is zoinbergs@gmail.com. He is an individual U.S. citizen.  On November 24, 2023, he was visiting a Best Buy in Northglenn, CO, when he was accosted by Defendant Officers.

5.    Both JUAN PACHECO and MATTHEW LACKEY are police officers employed by the NORTHGLENN POLICE DEPARTMENT, which is located at 50 W Community Center Dr, Northglenn, CO, 80234.  Its phone number is (303) 450-8892.  The officers are being sued in their individual capacities for the actions they took, under color of law in full police uniform, on November 24, 2023, at the Northglenn Best Buy store.

2

## JURISDICTION AND VENUE

6.      This action arises under the Fourth Amendment of the U.S. Constitution, actionable pursuant to 42 U.S.C. § 1983.

7.      Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

8.      Venue is proper pursuant to 28 U.S.C. § 1391(b), because the incidents and resultant injuries to Plaintiff giving rise to this action occurred in Northglenn, CO.

## FACTUAL BACKGROUND

9.      Plaintiff incorporates all preceding paragraphs by reference.

10.     On or about November 24, 2023, at approximately 12:59pm, Plaintiff entered a Best Buy store located at 104 W 104th Ave, Denver, CO, 80234, to go shopping.

11.     While inside the store, at approximately 1:02pm, Plaintiff purchased a Google Chromecast 4K for $41.31 at the closest register to where it was being offered for sale (the home theater department register).  He paid with his Venmo Debit Card ending in 2889, which is associated with his Best Buy account, and to which then prompted the cashier to inform him that the store had just automatically emailed [only] his receipt to him, per company policy, at the email address associated with his Best Buy account.  The cashier did not offer a plastic bag to Plaintiff, as it was determined, also per company policy, that Plaintiff did not need one for his single item purchase.

12.     At approximately 1:10pm, Plaintiff began to leave the store with his Chromecast held openly in one of his hands.  While on his way out through the store's east door marked "exit," Plaintiff was approached from the left by a Best Buy store employee [which we'll hereafter refer to as "John Doe" until he can be potentially identified later through discovery] who had been "posted up" near that exit.  John Doe asked Plaintiff to see his receipt, to which

Plaintiff replied, "I plead the fifth."  After hearing that response, John Doe then stepped in front of Plaintiff in order to prevent him from leaving.  Plaintiff then tried to step around John Doe, in order to keep leaving the store, but was prevented from doing so by the store employee, who continued to remain standing directly in front of Plaintiff.

13.    Right after John Doe prevented Plaintiff from leaving the store, a non-store uniformed security guard [which we'll hereafter refer to as "Security Guard" until he can be potentially identified later through discovery] who had also been "posted up" at the store's exit, also stepped in front of Plaintiff in order to further prevent him from leaving.  Security Guard likewise asked Plaintiff to see his receipt, to which Plaintiff this time did not provide a reply to.  Both John Doe and Security Guard now simultaneously stood directly in front of Plaintiff, which prevented him from leaving through the store's eastern exit.

14.    In response to the actions taken by John Doe and Security Guard, Plaintiff turned to the left and began walking toward the store's west door marked "entrance," in order to leave through that particular door.  In response, Security Guard rushed over to the west door, and once again stepped in front of Plaintiff.  Plaintiff then attempted to step around Security Guard, in order to leave the store through its western entrance, but was prevented from doing so by the Security Guard.  Both John Doe and Security Guard now simultaneously stood between Plaintiff and all available entrances and exits to the store, which prevented him from leaving, *through any of its doors,* the store altogether.  At this point, while standing directly in front of Security Guard, Plaintiff placed his recently purchased Chromecast product into the inside of his left jacket pocket, in order to discourage Security Guard from "snatching" it out of his open hand.

15.    At no time whatsoever on that day of November 24, 2023 did Plaintiff ever see

John Doe or Security Guard be located anywhere else in the store, aside from being "posted up" at its exit. Neither John Doe nor Security Guard were ever seen by Plaintiff to have ever followed him through the store, let alone observe him shop and pay for his item in the store's home theater department. The very first time Plaintiff ever saw John Doe and Security Guard in the store was when he saw them "posted up" at its exit as he began to leave the store.

16.    While still standing directly in front of Plaintiff, Plaintiff heard Security Guard radio into dispatch the number "304." A few seconds after that, he heard him radio in something to the effect of, "I got an individual attempted theft right now." A few seconds after that, [presumably upon receiving no answer from dispatch], Plaintiff then heard Security Guard call over to John Doe [who was still standing at the store's east exit] and say to him something to the effect of, "Would you get them over here, please?" Plaintiff witnessed John Doe then use his own radio to call the store's off-duty Northglenn Police Officers over for assistance.

17.    While the Northglenn Police made their way from elsewhere in the store over to its entrance/exit doors, Plaintiff saw John Doe and Security Guard stay – the whole time – right where they had been presently standing. At no time whatsoever on that day of November 24, 2023 did Plaintiff ever see John Doe or Security Guard speak with any store employees, check register records, or view surveillance video footage of any kind, before speaking with the Northglenn Police Department upon their arrival at the store's entrance/exit doors. Plaintiff witnessed less than a minute pass from when the Police were called over to when they arrived and began taking over the interaction.

18.    Once the Northglenn Police Department arrived at the store's western entrance, Security Guard told Defendant Officer Juan Pacheco [while pointing to the Chromecast

5

protruding from Plaintiff's left jacket pocket] something to the effect of, "He has a product

right here that he has not paid for.  Sir, you can't leave with that."  Officer Pacheco then asked

Plaintiff something to the effect of, "You got a receipt, man?"  Before Plaintiff could answer

that question though, Defendant Officer Matthew Lackey approached him from behind and

asked him, "Hey, how's it going?"  To which Plaintiff replied, "Not too bad."

19.    Officer Lackey then asked Plaintiff, "You got product that you didn't pay for?"

Plaintiff replied, "I plead the fifth."  Officer Lackey then told Plaintiff to take his hands, place them

behind his back, and interlock his fingers, so that the Officer could place him into handcuffs.

20.    Both Officer Pacheco and Officer Lackey then placed Plaintiff into handcuffs.

The following conversation took place directly thereafter between Plaintiff and the Officers:

WILLIAM    *"Ouch, ouch, don't break my fucking arms!"*

LACKEY    *"Alright."*

PACHECO    *"Relax."*

WILLIAM    *"Seriously."*

PACHECO    *"We're not doing anything.  We're just holding you."*

LACKEY    *"What's your name?"*

WILLIAM    *"William Montgomery.  Wait, I'm sorry."*

PACHECO    *"It's too late for sorries."*

WILLIAM    *"If I cooperate, will you guys go easy on me?"*

LACKEY    *"It's already too late for that.  We're gonna go out to my car.  I'll get
it for ya.  I'll get this right here actually.  Here you go."*  [Lackey
says these last few sentences while removing the Chromecast from
Plaintiff's left jacket pocket and handing it to a nearby employee].

LACKEY    *"Anything else that doesn't belong to you?"*

6

PACHECO     *"This?"*  [Pacheco says this right before removing a box from Plaintiff's right pant pocket that contained a product not even sold at Best Buy stores].

WILLIAM     *"Look, if I cooperate..."*

LACKEY     *"There is no if."*

WILLIAM     *"...will you guys cut me a citation?  No, I mean, like..."*

LACKEY     *"Kay, we're gonna figure it out."*

WILLIAM     *"Citation, man?"*

LACKEY     *"Yeah, look at it this way..."*

LACKEY     *"We'll get a vet, we'll come back for an evalu, we'll cut him [a citation]. [Turning to Guard] You guys got store trespass?  You guys do store trespass?"*

GUARD     [Turning to a nearby store employee] *"You guys do store trespass here?"*

EMPLOYEE     *"Yeah."*

LACKEY     *"Okay."*

LACKEY     *"Nora 586."*

DISPATCH     *"Nora 586."*

LACKEY     *"We're gonna have one detained, can you give us a CR for shoplift?"*

WILLIAM     *"What's your name?"*

LACKEY     *"It's Officer Lackey.  Do you have any ID on you?"*

WILLIAM     *"Sorry, what?"*

LACKEY     *"Do you have ID on you?"*

WILLIAM     *"Yeah.  Do I have to show it to you?"*

LACKEY     *"You do."*

WILLIAM     *"Okay."*

LACKEY        *"Do you have any needles, weapons, drugs?"*

WILLIAM       *"No, no, no."*

LACKEY        *"Kay.  Some other things we missed?"*

WILLIAM       *"I mean, that's, that's a non-prescription drug right there."*

LACKEY        *"Okay.  Where'd you get this?"* [Lackey says this while removing a box of non-prescription Omeprazole from Plaintiff's left pant pocket].

WILLIAM       *"King Soopers."*

LACKEY        *"Did you buy it?"*

WILLIAM       *"I got a, I got a medical condition."*

LACKEY        *"Did you buy it?"*

WILLIAM       *"Look, dude, I plead the fifth."*

LACKEY        *"Okay, so I'm gonna seize it.  I'm gonna book it into, as safe keeping.  I'm gonna notify King Soopers.  And if you get a receipt, you can come get it."*

    -   -   -

LACKEY        *"You're gonna sit in the back of my patrol car while I work on a ticket."*

LACKEY        *"You're going to get a ticket, and then you can get outta here."*

    -   -   -

LACKEY        [The Officer proceeds to rifle through Plaintiff's wallet that he had removed from his rear pant pocket earlier, in order to seize his ID].

    -   -   -

WILLIAM       *"So what did the store say?  They have video footage or something?"*

LACKEY        *"Oh yeah."*

WILLIAM       *"They told you that?"*

LACKEY        *"Yes.  They always have video footage. That's*

why they hired us, also, to walk around the store."

WILLIAM    *"So you didn't look at the video footage for yourself?"*

LACKEY    *"Don't need to.  The store has already stopped you, asked you for a receipt, you refused, they got their merchandise back, they're gonna give us evalu, cuttin' you a ticket."*

WILLIAM    *"I understand."*

-    -    -

LACKEY    *"Why would you just want a ticket if you didn't do anything wrong?"*

WILLIAM    *"Well, I said I didn't want to go to jail."*

LACKEY    *"Who said you're going to jail!?"*

21.    Officer Lackey then proceeded to fill out Plaintiff's citation.  A few minutes later, after completing the citation, the Officer went back into the store to speak with Security Guard and some store employees.  The following conversation took place between them:

LACKEY    *"You guys have your video?"*

GUARD    *"Yeah, Officer, this is [unintelligible] strange, is they apparently looked, and he actually paid for this."*

LACKEY    *"Okay."*

GUARD    *"So, I don't know whatcha wanna do.  It's a brand new situation."*

LACKEY    *"How many stuff did he bring, or did he conceal?"*

GUARD    *"So these two things are the only things I know of."*

LACKEY    *"Did you, do you have any of this on video?"*

GUARD    [While turning to a nearby employee and showing her Plaintiff's box of headphones not even sold by that entire store chain] *"So, also, really quick, you're saying this does not belong to you?"*

EMPLOYEE    *"No, it doesn't."*

9

LACKEY        *"Okay.  And he bought this?"* [While pointing to the Chromecast].

EMPLOYEE    *"Well, we found a receipt for it."*

LACKEY        *"Where at?"*

EMPLOYEE    *"...[unintelligible]..."*

LACKEY        *"In where?"*

EMPLOYEE    *"Home theater."*

LACKEY        *"Okay."*

ANONYMOUS  *"What are you trying to grab?"*

LACKEY        *"So, but he still failed to present a receipt."*

GUARD         *"Yes."*

LACKEY        *"Okay."*

EMPLOYEE    *"...[unintelligible]..."*

LACKEY        *"Okay.  So what do you guys wanna do?  'Cause obviously
I can't cut him a summons for it if he bought it.  And,
you don't know about—this doesn't belong to you, so."*

EMPLOYEE    *"...[unintelligible]..."*

LACKEY        *"Do you have, can you guys reprint the receipt for the Google Chromecast?"*

EMPLOYEE    *"...[unintelligible]..."*

LACKEY        *"Okay.  So ultimately, like this falls on you guys and probably your store
management, as a 'bad stop.'  I dunno your guys' policies, but I'm ultimately
going to release him, but he's probably gonna wanna talk to somebody's boss, so."*

EMPLOYEE    *"Well, my boss* [John Doe] *is the one who asked him to produce his receipt."*

LACKEY        *"Yeah?  Yeah, I, I get it.  So, umm, if you guys have it, I'm
gonna go get him outta cuffs and we'll give him his stuff back."*

EMPLOYEE    *"Yeah, no worries."*

LACKEY    *"Okay."*

22.    Officer Lackey then went back outside to his patrol vehicle, removed his handcuffs off of Plaintiff, and gave him all his personal belongings back.  Plaintiff then asked for and received business cards from the two Defendant Officers, and went about his day.

23.    At no point in time on that day of November 24, 2023 did Plaintiff ever "conceal" anything, whatsoever, during this shopping experience.  He did not "conceal" anything in front of [let alone not in front of] any store employees, security guards, police officers, or the public at large. **He simply did not "conceal" anything, at any point, in front of anybody, at all, ever, period.** Instead, Plaintiff merely grabbed a Chromecast product off a shelf, after which he held it openly in his hands while he walked it to a nearby register, where he then openly purchased it at that register, and where he then continued to hold it openly in his hands as he attempted to exit the store.

24.    Likewise, at no point in time on that day of November 24, 2023 did Plaintiff ever once place into, or remove, anything from any pant pocket, either, during this shopping experience.  Specifically, the box of headphones not even sold by Best Buy, as well as the box of non-prescription Omeprazole, were both already located inside Plaintiff's pant pockets before he entered the Northglenn Best Buy store, as he entered it, and they remained there, fully in his pant pockets, all throughout his entire shopping experience while inside of the Best Buy store.  The first time said boxes were removed from Plaintiff's pockets were when they were removed by Defendant Officers during their custodial inventory of him post shopping experience.

25.    At no point in time, in his entire life, has Plaintiff ever been made aware of any specific or official [let alone general or unofficial] policy employed [let alone enforced] by Best Buy regarding the act [compulsory or not] of "receipt showing."  Nowhere has Plaintiff ever seen such a policy posted in any Best Buy store, nor spoken to him by any Best Buy employee, nor available for him [or any others] to review on Best Buy's [or any other's] publicly available website.  To this date,

Plaintiff still has literally no earthly idea, whatsoever, what Best Buy's policy actually is regarding "receipt showing" [if such a policy even exists, unofficial or not, in the first place].

26.    Ultimately, Plaintiff experienced numerous manifestations of significant mental anguish and emotional distress both during and after his adverse encounter with Defendants.  Such manifestations include (but are not limited to): helplessness, anger, frustration, shock, disappointment, inconvenience, embarrassment, humiliation, severe indignity, devastation, reputational damage, apprehensiveness, anxiety, mistrust in authority, marked diminishment in quality of life, bitterness, insomnia, and overwhelming grief.

## FIRST CLAIM FOR RELIEF
### *Unlawful Seizure Of Person In Violation Of The Fourth Amendment Of The U.S. Constitution*
(Against Both Individual Defendant Officers)

27.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

28.    When Officers Juan Pacheco and Matthew Lackey arrived on-scene, they non-custodially arrested Plaintiff, but failed to perform any meaningful investigation whatsoever into the propriety of him actually stealing from the store prior to conducting said arrest.  Specifically, the "meaningful investigation" that the Officers failed to perform, was to [otherwise] interview witnesses readily available at the scene, research store records, or view the store's video surveillance footage.  Instead, after being called to the front of the store by John Doe and Security Guard [i.e. a generic call for service], the Officers simply turned to Plaintiff, asked him to show his receipt, and arrested him *on-the-spot* for simply failing to produce one.  The Officers had a clear and unambiguous opportunity to ask John Doe and/or Security Guard – *who had been standing right there next to Plaintiff* – literally **ANY** investigatory questions *whatsoever* that would have

12

helped clarify the circumstances of Plaintiff's detention.  But instead, they chose to not direct **a single word** to the staff, which was an impermissible **"wholesale delegation"** of their [i.e. what should have been an **independent** determination of their] probable cause analysis.

29.    ***Just like*** the Officer in *Harbin v. City of Albuquerque,* No. CIV 05-550 LCS/RLP, 13 (D.N.M. Apr. 12, 2006), Officers Juan Pacheco and Matthew Lackey "conducted no independent investigation before handcuffing [Plaintiff], instead relying only on the allegations of [the store employee]."  As such, the Officers "violated Plaintiff's Fourth Amendment rights by . . . arresting [him] without probable cause."  *Id.*

30.    Moreover, because Defendant Officers arrived **in less than a minute** after being called to the front, they would have known that neither John Doe, nor Security Guard, ***would have even had a reasonable opportunity of their own to fairly investigate*** into the validity of Plaintiff's alleged shoplifting.  This dispositively distinguishes the instant case from that of *Montgomery v. Calvano,* No. 21-1134, 2022 WL 1132212 (10th Cir. Apr. 18, 2022), in which the Officer in that case (a) **commissioned** several employees to investigate into Plaintiff's purported shoplifting, then (b) arrested him **14 minutes later** after said employees presumably [but not actually, which is another story] **performed a meaningful investigation, came back,** and **reported to him** that Plaintiff had *indeed* stolen something.  **No such 14 minute investigatory window took place in the instant case,** which renders this situation more closely analogous to that of *Harbin v. City of Albuquerque* [in which the Officer simply showed up and hastily arrested the suspect based solely on the generic "call for service" that it had received].  Indeed, by Officer Lackey's own admission as captured on his bodycam [upon being asked by Plaintiff if he bothered to look at any video footage for himself]: *"Don't need to.  The store has*

*already stopped you, asked you for a receipt, you refused, they got their merchandise back, they're gonna give us evalu, cuttin' you a ticket."* However, such **utter "wholesale delegation"** is <u>patently illegal</u> as outlined in *Harbin* [and the authorities to which it is premised on].

31.     A request to see a receipt is merely "**a request for consent to search**, [and] the customer . . . always retain[s] the right to refuse that consent, or refuse to hand over the receipt." Victoria S. Salzmann, *Big-Box Bullies Bust Benign Buyer Behavior: WalMart, Get Your Hands Off My Receipt!,* 4 Fla. A&M U. L. Rev. (2009)). This is because "receipt-checking is not related to any fact of theft other than presence in the store, [therefore] detention for failure to give consent does not create an adequate basis for invoking the privilege." *Id.* In other words, "without *particularized* facts to reasonably justify a stop, systematic detention of most or all customers may implicate false imprisonment." *Id.* Therefore, "[l]aw enforcement may draw no inference justifying a search or seizure from a refusal to cooperate. That is, officers lacking legal justification to detain a person may not **bootstrap** noncompliance into justification for a detention, because in that event a citizen would in effect have no way of declining to participate in a 'consensual' encounter with the police." *Brief of the United States as Amicus Curiae Supporting Petitioner at 25, Florida v. Bostick,* No. 89-1717. This is because "[a]ny other rule would make a mockery of the reasonable suspicion and probable cause requirements, as well as the consent doctrine. These legal principles would be considerably less effective if citizens' insistence that searches and seizures be conducted in conformity with constitutional norms could create the suspicion or cause that renders their consent unnecessary." *United States v. Hunnicutt,* 135 F.3d 1345 (10th Cir. 1998). *See also U.S. v. Carter,* 985 F.2d 1095, 1097 (D.C. Cir. 1993) ("The constitutional right to withdraw one's consent to a search would be of little value if the very fact of

14

choosing to exercise that right could serve as any part of the basis for finding the reasonable suspicion that makes consent unnecessary."). See also *State v. Smith,* 674 P.2d 562 (Okla. Crim. App. 1984) ("It is well known to the public that shoplifting is an everyday occurrence which constantly plagues merchants in Oklahoma and elsewhere. Are law enforcement authorities then to be allowed to establish fixed checkpoints, permanent or otherwise, outside of every shopping center in the area to question all exiting shoppers as to whether they possess sales receipts? Are law enforcement authorities to be allowed to demand all shoppers to produce such receipts or be subject to arrest everytime they go shopping? The potential for abuse is apparent."). *See also Montgomery v. Lore,* No. 23-1106 (10th Cir. Dec 13, 2023) (when discussing that Plaintiff's refusal to show a receipt upon request was insufficient to provide reasonable suspicion to justify his detention with) ("[A] person's 'refusal to . . . answer does not, without more, furnish' reasonable, objective grounds for a detention." (citing *Royer,* 460 U.S. at 498)).

32.    The intentional and/or reckless conduct as described herein, committed by Defendant Officers Juan Pacheco and Matthew Lackey, deprived Plaintiff William Montgomery of the rights, privileges, liberties, and immunities secured by the U.S. Constitution, including the right to be free from unlawful seizures of the person, made actionable pursuant to 42 U.S.C. § 1983, and which proximately caused Plaintiff loss of liberty and other emotional harms.

### SECOND CLAIM FOR RELIEF
*Unlawful Search And Seizure Of Property In Violation*
*Of The Fourth Amendment Of The U.S. Constitution*
(Against Both Individual Defendant Officers)

33.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

34.     Defendant Officers Juan Pacheco & Matthew Lackey performed an impermissible search and seizure of Plaintiff personal belongings, but did so only upon him being **non-custodially** arrested by them.  Plaintiff's pants pockets contained several items in them that would not have reasonably felt like weapons to a trained officer – namely a box of headphones, a box of non-prescription Omeprazole, and a wallet – yet all such items were impermissibly removed from their respective pockets by the Officers without probable cause existing to lawfully remove them with. That is, probable cause did not exist to believe that said items were unlawful "contraband" of any kind, such as drugs or stolen merchandise, nor would such items have been reasonably construed by a rational person as being "instrumentalities or evidence of the specific crime" [of shoplifting the Chromecast] for which Plaintiff was arrested [such as knifes, scissors, tags, etc.].

35.     "The two historical rationales for the 'search incident to arrest' exception [are]: (1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial." *Knowles v. Iowa,* 525 U.S. 113, 116 (1998).  Therefore, **a full-blown "custodial arrest" [and not just an "on-scene handcuffing, citing, and releasing" event] "**[is] necessary to support a search incident to arrest." *U.S. v. Parr,* 843 F.2d 1228, 1230 (9th Cir. 1988).  This is because "the danger to an officer is far greater in the case of **the extended exposure which follows the taking of a suspect into custody and transporting him to the police station** than in the case of the relatively fleeting contact resulting from the typical *Terry*-type stop." *United States v. Robinson,* 414 U.S. 218, 234-35 (1973).  Importantly, "[w]here there is no formal arrest, as in the case before us, a person might well be less hostile to the police and less likely to take conspicuous, immediate steps to destroy incriminating evidence on his person.  Since he knows he is going to be released, he might be likely instead to be

16

concerned with diverting attention away from himself.  Accordingly, we do not hold that a full

*Chimel* search would have been justified in this case without a formal arrest and without a

warrant."  *Cupp v. Murphy,* 412 U.S. 291, 296 (1973).  *See also U.S. v. Garcia,* 376 F.3d 648,

650 (7th Cir. 2004) ("Because the principal justifications for full searches are the need to detect

risks to the arresting officers and to preserve evidence that suspects could destroy **on the way to**

**the lockup,** there is slight warrant for intrusive steps when detention is brief and the drivers [and

most evidence] will soon depart."); *U.S. v. Dimick,* 790 F. Supp. 1543, 1552 (D. Colo. 1992)

("Since the justifications for a warrantless search incident to arrest are premised on the exigencies

created by a valid actual arrest, there is no basis, theoretical or practical, for treating this as a search

incident to arrest."); *United States v. Robinson,* 414 U.S. 218, 235 n.5 (1973) ("The danger to the

police officer flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty,

and not from the grounds for arrest."); *Belote v. State,* 411 Md. 104, 113 (Md. 2009) ("Where there

is no custodial arrest, however, these underlying rationales for a search incident to an arrest do not

exist."); *United States v. Gonzalez,* 763 F.2d 1127, 1130 n. 1 (10th Cir. 1985) ("If such a traffic stop

were like a traditional custodial arrest, then as part of the search incident to arrest the apprehending

officer could search the entire passenger compartment.  But if, as we conclude here, the traffic stop

only amounts to an investigative detention, the officer's freedom to search is more limited; his

motivation for the search must be related to concern for protecting himself or others rather than any

concern with preserving evidence."); *State v. McKenna,* 91 Wn. App. 554, 561 (Wash. Ct. App.

1998) ("**Although an officer may search incident to a lawful custodial arrest, he or she may**

**not search incident to a lawful noncustodial arrest.**  It is thought that the officer and arrestee

will be in close proximity for only a few minutes, and the arrestee, who is about to be released

anyway, will have little motivation to use a weapon or destroy evidence.").

36.    More importantly on this topic, is that it is the arresting officer's ***objective***

***manifestations of his intention to actually carry out a full-blown transporting and booking (and***

***not just "an on-scene handcuffing, citing, and releasing")*** that governs the "search incident to

arrest" exception.  Specifically, even though Plaintiff was physically restrained after placing his

hands behind his back, handcuffed, and taken to Defendant Officers' patrol vehicle, none of these

actions ***objectively*** convey to a reasonable person in Plaintiff's position ***that he is about to be***

***CUSTODIALLY arrested*** (i.e. ***fully transported and booked*** into the local jail) sufficient to

"motivate him to use a weapon or destroy evidence."  *State v. McKenna,* 91 Wn. App. 554, 561

(Wash. Ct. App. 1998).  Indeed, as the Officers' own bodycam footage indisputably reveals,

**PRECISELY THE OPPOSITE OCCURRED,** wherein Plaintiff was repeatedly told ***that he***

***would only be issued a citation, on-scene, and released directly thereafter***:

| | |
|---|---|
| WILLIAM | *"Look, if I cooperate..."* |
| LACKEY | *"There is no if."* |
| WILLIAM | ***"...will you guys cut me a citation?*** *No, I mean, like..."* |
| LACKEY | ***"Kay, we're gonna figure it out."*** |
| WILLIAM | ***"Citation, man?"*** |
| LACKEY | ***"Yeah, look at it this way..."*** |
| LACKEY | *"We'll get a vet, we'll come back for an evalu, **we'll cut him [a citation]**..."* |
| LACKEY | ***"We're gonna have one detained,*** *can you give us a CR for shoplift?"* |
| | -  -  - |
| LACKEY | ***"You're gonna sit in the back of my patrol car while I work on a ticket."*** |

18

LACKEY      ***"You're going to get a ticket, and then you can get outta here."***

- - -

LACKEY      *"Why would you just want a ticket if you didn't do anything wrong?"*

WILLIAM     *"Well, I said I didn't want to go to jail."*

LACKEY      ***"Who said you're going to jail!?"***

32.      "A suspect is under custodial arrest [only] when 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'"  *Ochana v. Flores,* 347 F.3d 266, 270 (7th Cir. 2003).  ***Yet in the instant case, such is not, in any respects whatsoever, what actually faced Plaintiff.***  Alternatively, "[a]n individual who does not believe that he has been arrested has no need to effect an escape or to harm the police officer that has detained him. Moreover, an individual who does not believe that he has been arrested has little or no need to destroy evidence and, thus, almost certainly will not destroy evidence that might be in his possession.  Therefore, an officer's objective 'manifestation of purpose and authority' at the 'moment of arrest,' by words or conduct, which signal to an individual that he or she is under arrest, will be, and always has been, significant in determining whether a custodial arrest has occurred." *Belote v. State,* 411 Md. 104, 113 (Md. 2009).  Thus, while Plaintiff was undoubtedly handcuffed and placed into the back of a patrol vehicle*,* such factors do not ***necessarily*** transform his "arrest" **into a full custodial arrest** *for purposes of now justifying* a "full search incident thereto." *See People v. Smith,* 17 Cal.App.3d 604, 606-7 (Cal. Ct. App. 1971) (held that search of defendant was unlawful despite him being "handcuffed and in the police car"); *State v. Marten-Hoye,* 307 Wis. 2d 671, 691 (Wis. Ct. App. 2008) ("We do not agree that police use of

19

handcuffs transformed the interaction here into an arrest"); *People v. Lopez,* 4 Cal.App.5th 815, 828 (Cal. Ct. App. 2016) ("The fact defendant was in handcuffs when the *Webster*-type search occurred does not, in our view, transform the limited search for identification into a full search of the passenger compartment incident to arrest."); *U.S. v. Parr,* 843 F.2d 1228, 1230 (9th Cir. 1988) ("[I]t is not clear that the police action taken here is the type of 'custodial arrest' necessary to support a search incident to arrest. Certainly, there is no *per se* rule that detention in a patrol car constitutes an arrest."); *U.S. v. Rodriguez,* 831 F.2d 162, 166 (7th Cir. 1987) ("[S]itting in the patrol car for several minutes was merely a normal part of traffic police procedure for identifying delinquent drivers. The steps taken did not connote an intent to take Rodriguez into custody.").

37.     Now, regarding probable cause to search for "instrumentalities or evidence of the specific crime" of shoplifting, ***even if*** probable cause existed to believe that Plaintiff had shoplifted that day of November 24, 2023, it would have **only** existed for the merchandise that he was specifically accused of walking out of the store with. That is, the merchandise that was located in Plaintiff's left jacket pocket, that Security Guard personally observed him place into that pocket, that Security Guard pointed to in front of Officer Pacheco, that both Officers saw protruding somewhat from that pocket, and to which Officer Lackey eventually removed from that pocket without needing to otherwise conduct any actual search of that pocket. **In other words, probable cause did not exist to search for and/or seize the general contents of any of Plaintiff's other pockets that day.** This is because such contents would not have had the capacity of being "instrumentalities or evidence of the specific crime" for which he was being accused of committing – *the crime of stealing [strictly]* *the merchandise he was observed* *walking out of the store with.* In other words, "all evidence necessary to prosecute ***THAT*** offense

20

had been obtained." *Knowles v. Iowa,* 525 U.S. 113, 119 S. Ct. 484 (1998).  As such, "there must be **independent** probable cause to believe the [other pockets] [would otherwise also] contain contraband," *People v. Superior Court (Kiefer),* 3 Cal.3d 807, 807 (Cal. 1970), and to which, in the instant case, was *NOT* what Officers Pacheco and Lackey faced that day.

38.      To better understand why a general search of Plaintiff's pockets would be inappropriate, an analogy can be made between an officer's probable cause in the field, and a warrant sought after judicially.  *See People v. Marsh,* 20 N.Y.2d 98, 281 N.Y.S.2d 789, 228 N.E.2d 783 (N.Y. 1967) (describing how judicial warrants do not give officers "any greater power to conduct a search than he would have possessed had he actually seen the infraction").  To begin, the Supreme Court has held that, "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927).  Thus, to consider valid a **purely generic** warrant that "stolen merchandise" will be found "on a person," would be to sanction a search "so broad and general as to provide virtually no guidance to one searching [that what they find would indeed be] stolen." *Commonwealth v. Taylor,* 383 Mass. 272, 275 (Mass. 1981).  This is because such a warrant "establishes [no] probability that the items sought will constitute a large portion of the inventory to be searched." *Id.*  In other words, "[n]either the warrant nor the affidavit [would be] set[ting] out clear standards which assure the magistrate that the executing officer will be able to differentiate a [stolen] [item] from a legitimate [item]." *United States v. Klein,* 565 F.2d 183, 188 (1st Cir. 1977).  Critically, "such investigation could occur only *after* seizure." *Id.*  Consequently, "[a] warrant for 'stolen,' 'pirate,' or 'illegal' goods, be they watches,

21

drugs, clothing, or tapes does not become sufficiently particular by ***after the fact*** explanations as to how these products were differentiated from legal merchandise when the seizures were carried out." *Id.* "Thus, we conclude that because the affidavit and the warrant failed to provide any ***before the fact*** guidance to the executing officers as to which tapes were pirate reproductions there exists a substantial and unjustifiable likelihood of a violation of personal rights. " *Id.* Ultimately, **"the danger inherent in such a situation [is that] that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will."** *Texas v. Brown,* 460 U.S. 730, 748 (1983). *See also People v. Superior Court* (Kiefer), 3 Cal.3d 807, 807 (Cal. 1970) ("A search 'prompted by a general curiosity to ascertain what, if anything, was within the defendant's vehicle' **is manifestly exploratory in nature,** and violates both the letter and the spirit of the Fourth Amendment.").

39.    Most importantly on this topic, is that Plaintiff has already been successful in this Court regarding his exercising of these exact rights. In *Montgomery v. Lore,* D. Colo Civil Case No. 1:21-cv-02553-PAB-CYC, this Court held that a police officer lacked lawful justification to search for and/or seize a couple of non-contraband, non-weapon RV lights that were located in Plaintiff jacket pocket – because of how the officer "did not witness plaintiff walk out of the store with [them] in his hands." *Feb 4, 2025 Order Denying Def's MTD Ptf's Amended Complaint.* Indeed, this District Court made this holding ***even assuming*** that the officer had [qualified-immunity-invoked arguable] probable cause to issue Plaintiff a citation for shoplifting a couple of unrelated wipes packages that the officer had observed him walking out with. *See also Montgomery v. Cruz,* No. 20-cv-03189-PAB-MEH (D. Colo. Sep. 11, 2023) (held that a full search, beyond the scope of *Terry,* was impermissible under the same circumstances).

40.     The intentional and/or reckless conduct as described herein, committed by Defendant Officers Juan Pacheco and Matthew Lackey, deprived Plaintiff William Montgomery of the rights, privileges, liberties, and immunities secured by the U.S. Constitution, including the right to be free from unlawful searches and seizures, made actionable pursuant to 42 U.S.C. § 1983, and which proximately caused Plaintiff loss of liberty and other emotional harms.

### THIRD CLAIM FOR RELIEF
*Unlawful Search Of Wallet And Seizure Of ID In Violation Of The Fourth Amendment Of The U.S. Constitution*
(Against Individual Defendant Officer Matthew Lackey)

41.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

42.     During Plaintiff's detention, Officer Lackey opened up his wallet and removed his ID from it, but did not have consent by him in order to lawfully do so.

43.     *See Montgomery v. Cruz,* No. 1:20-cv-03189-PAB-CYC (D. Colo. Sep. 11, 2023) ("Officer Cruz has not met his burden of proving that Mr. Montgomery consented to the search of his wallet or the seizure of his ID card.").

44.     The intentional and/or reckless conduct as described herein, committed by Defendant Officer Matthew Lackey, deprived Plaintiff William Montgomery of the rights, privileges, liberties, and immunities secured by the U.S. Constitution, including the right to be free from unlawful searches and seizures, made actionable pursuant to 42 U.S.C. § 1983, and which proximately caused Plaintiff loss of liberty and other emotional harms.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against all Defendants for compensatory damages, punitive damages against the individual Defendants, emotional distress damages, dignitary damages, for interest as allowed by law, for costs, expert witness fees, and reasonable attorney fees as allowed by statute or as otherwise allowed by law, and for any other and further relief that this Court shall deem just and proper.

## **PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

## **PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information contained in this complaint is true and correct.

By signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of the Federal Rules of Civil Procedure.

Respectfully submitted on this, the 19th day of November, 2025.

*s/ William Montgomery*
**William Montgomery**
2443 S University Blvd # 129
Denver, CO  80210
(970) 412-5463
*zoinbergs@gmail.com*

24